Mr. Kerner, we're ready when you are. Thank you so much, Your Honor. May it please the Court, I'm Hugh Kerner from Hollywood, Florida, on behalf of the appellants Harold Smith, Laura Smith, and Shanikqua Smith. The District Court's order in this case approved a warrantless call-out procedure that used the lower reasonable suspicion standard instead of probable cause and essentially nullifies the protections set forth by the United States Supreme Court in Payton, Stiegall, and Jardines. Let me ask you a quick question. Is this call-out procedure a thing? Like, I've got to confess, I hadn't seen it before this case, but, I mean, do police departments do this kind of thing generally? The Game Over Task Force certainly does it regularly and routinely. It was their standard practice. So I can't speak to whether... Because even if they have a warrant, they'd prefer the person come out, obviously. Oh, come on, Counsel, that's not a trick question. I think that the position that they take is that in lieu of the exercise of having to get the warrant, that this is... Well, even if they get the warrant, they still call the person out. Even if you have a warrant, you don't go charging in the house. That I can't say, and there's no, actually, Your Honor, that's a good question. There's no record evidence as to if the government has a search warrant. Let me ask you this. If they had known the violent criminal they were looking for was in the house, would it have been unconstitutional for them to call out that person? So under Payton, they have to have knowledge, reason to believe probable cause. If they knew. They had a video of him going in, positively identified. He's in there. As long as they can establish under Payton that he lives there, they reasonably... No, he didn't live there. He just went in there. That would not be sufficient under Payton. Payton allows you... So if they know a violent criminal, armed and dangerous, is in a house, they can't call and ask him to come out unless it's his house? Come on, Counsel. Maybe I'm misunderstanding. What I'm saying is if they've gone up to this house, they see somebody looking out the window. They have three relatives of the violent criminal standing beside them and say, That's John. I'd recognize him anywhere. John, come out. Can the officers then call on John, the armed and dangerous criminal, to come out without a warrant to go in the house and arrest him? Your Honor, without violating Jardines, I think you can call out to any house. I would agree with the question. Fine. So if they have reasonable cause to believe the violent criminal is in there... They don't need reasonable cause. Let me finish. If they have probable cause to believe he's in there, can they call out other members of the house? That's different. I think you can call out to any house. I don't know that you violate the rule of Jardines if you're not on the curtilage and you call out to any home in any neighborhood, whether you're a Girl Scout or a trick-or-treater or a police officer. I think that the implied license doesn't necessarily require that you go to the front door and knock. And I think that people all the time call out to homes under various circumstances. Can they do that then? You were saying they couldn't if they were on the curtilage. On the front door, that's in the curtilage, right? The Jardines case gives you an implied license to go to the front door with only minor deviation by the appropriate path for the limited purpose of talking. If you're a hawker or a peddler or a Girl Scout or a trick-or-treater and knock on the door and wait briefly to be received and if not, leave. But I don't think that there's any prohibition in Jardines or in Payton or in Stegall to calling out to your neighbor from the street or from the driveway. I think that there's a problem if you set up a police encampment. Or find the front door. You can certainly go out to the front door and go to the front door and knock. Okay. Say, is Normellis here? Normellis, isn't that the name of the person? Normellis. Pierre Vellis. Normellis, Pierre Vellis. Okay. I can't pronounce his last name very well. Nobody can. They say, is he here? They knock on the front door. Okay. Is that okay? Perfectly okay. Okay. So we've got this case, Knight v. Jacobson, right, that says that the officer can walk up, knock on the door, guy comes to the door, ask the guy to come out, and then stop him, stop and frisk him. Right. That's not at the point of a bayonet, though, so it's a little bit different. So, yeah, I think that under the knock and talk rubric, we can go to the front door if we're a police officer by the normal path for the purpose of talking, not for engaging in a search, engaging conversation. And if the fugitive suspect agrees to come out of the house and you don't meet the requirements of Peyton where you can have a warrant where you can go in, you can certainly ask people to come out. They do that all the time. So just tell me then, I'm sure I'm missing something, like what's the difference? This was sort of a more shock and awe kind of episode, but what at the end of the day is the difference? Yeah, I think that that's the difference, Your Honor. So the shock and awe itself is what violates the Fourth Amendment? Well, two things. We have under Jardines a prohibition against the police entering the curtilage, which they did. They had the house surrounded. They had officers at all four corners. They had Officer Erkstein and Figuereau in the back of the house in the curtilage. They had Gallo on one corner and Stoll on the other. They had, according to the testimony of my clients, police cars up on the lawn. So that would differentiate under Jardines, under Justice Scalia's analysis in Jardines, the court's assertion that it's a lawful knock and talk. It's not. That's completely prohibited in the absence of a search warrant. So if all that had happened here is the guys had been out on the curb at the driveway and they'd brought the shock and awe, the helicopters and the lights and the dogs and all that stuff, and called the guy out, no problem. It's just the curtilage violation. That's a great question. So at some point, Your Honor, whether you're standing at my front door or you're standing on my driveway, if you point a gun at me, I will comply with generally whatever you want. I think all of us would. So you've been seized under the Fourth Amendment. No one disagrees with that. And there's a distinction under the Knight case that you're alluding to and the scenario that I'm describing because there is a seizure of all the occupants of the residence. And, of course, under Michigan v. Summers and the cases that flow from that, there is this limited right for the police, when conducting a search pursuant to a warrant, to detain the occupants of the premises. But that privilege inheres to the police under circumstances where they go through the process of obtaining the warrant based on probable cause. The difficulty in this case is that there would not have been probable cause. And I need to explain myself. I've got no time left. The district court used and construed facts not in the light most favorable to my clients. Actually, in the exact opposite. It found that Normellis Pieravellis, who had been apprehended a year prior and was known by the police since the Game Over Task Force caught him to be 5'1 or 5'2, fit the description of my 5'9-inch, 50-year-old client. Normellis is 19. Sergeant Confred described him as a little fellow. He knew he was small. Brian Guilford said he was childlike in appearance from his previous encounter. The warrant from Cocoa Beach said that he was 5'1. That was Nellie Woodruff's warrant. You've got the warrants from the Sheriff's Office, on the other hand, and all their booking information that say he's 5'9 or 5'10. And my point is that construing the evidence in the light most favorable to my clients, you can't say that that's a match under Whitley v. Warden. If the police input all this false information into the soup, they can't use it. There's just one officer who said that it looked like the guy they were looking for, right? Yeah. It was Deputy Agent Erskine. How much inquiry do they have to make on that to at least go up there and holler at the house? I think they can, Judge. You can't surround it under Jardines. I don't think that you can remove people at the point of a bayonet. The home is still, hopefully, the first among equals under the Fourth Amendment. We haven't completely stripped that down. I mean the whole idea of Stiegald is they went to every associate's home looking for this individual and did this sort of thing, and it requires a judge looking at the evidence to find probable cause because under the competitive business of ferreting out crime and chasing really bad people, like Normalis Pieravellis, otherwise there would be problems for people like the Smith family who've owned that home for 20 years, raised their family there in peace, abided by the laws and sent their kids to college. So there was no evidence that this individual that they saw going in fit the description. There's a 9-inch height discrepancy. The district court found that there was a mistaken identification. Agent Erskine never agreed that there was an identification. He said, look, he matched the description because I was looking for an average-sized black male, which fits the description of everybody. But the cell phone was known to be at one of these two places. One of the two. One of the officers thought he saw the man they were looking for go into your client's house. He did not. He saw an average-sized black male that matched the description. He never made an identification. He couldn't. He never saw the person's face. Who thought it was the man? Well, he hoped it was, but he's off by, he's using a 5'9 measurement instead of a 5'. Made a mistake is what you're saying. I'm not saying he made a mistake, Your Honor. Let me ask you this in return to this question. I just want to make sure I understand your argument. If, in fact, there had been no mistake and the person they were looking for was in the house, this house, was there any violation of the constitutional rights of the plaintiffs? Yes. Under Stigall, this is a third-party house, so they have no information that he lived at that residence. I'm sorry. If they saw him going in, they actually saw him. He was in the house. I understand. Was there any violation of the constitutional rights of these three plaintiffs? All right. Maybe I'm not making myself clear. Under Peyton, if you have the arrest warrant for Normalis Pierrevelis and you have a reasonable belief it's his house, the search warrant is, the arrest warrant is a search warrant, right? Under Stigall, if it's a third-party premises like the Smith residence, and this guy's transitory, he had no home, they knew that. They knew he was a househopper. If it's a third-party residence, Peyton and Stigall protect the third party in the absence of there being a search warrant. And in the absence of exigent circumstances. They're not pled in this case. I mean, they ultimately could. They don't have to be pled. I mean, my hypothetical is they saw the violent criminal run into this house. And they were right. It was the violent criminal. A pursuit. I mean, I think there's your exception. Now, this wasn't pled. Exigent circumstances. It doesn't have to be pled, counsel. Under Genusa, and this court's under Judge Jordan's opinion in Genusa, exigent circumstances must be pled. I don't believe that's the law of the circuit. I'll take a look at that case, but I don't believe that's the law of the circuit. Genusa versus Cordova, I believe. I don't care who it's versus. If the facts that you've pled show exigent circumstances, and I'm hypothesizing those were the facts, I don't think you have to say qualified immunity based on exigent circumstances. Genusa, respectfully, that opinion states the opposite of that. You've said that three times. I've told you I'll check it. I will check it. But I'm just telling you, if that's the best you've got to stand on, I don't think it's that good. But whether it is or not, I'm exploring the hypothetical of if they saw him go into that house. Forget the pleadings. Forget the motions, the briefs, and everything else. If they saw him go into that house, what you have thereafter pleaded happened to these plaintiffs. If he was in the house, would that be a constitutional violation clearly established by law? Yeah, I mean, under the exigent circumstances law, if the fugitive does not know that you've seen him go into the house, it's not exigent circumstances under U.S. v. Kobin and all the cases that cite that. So, I mean, they sat there with the understanding that Normellos, Pierre Vellos, who they, to use your analogy, they mistakenly believe goes in, has no idea. So you're now saying that to be exigent circumstances, the criminal has to understand that it's exigent circumstances, that has to be conveyed to him. I'm just saying that under the United States Supreme Court in the Eleventh Circuit's precedent, that there's normally not exigent circumstances unless the person, under circumstances where the fugitive does not know that they're being surveilled by the police. In addition, there's no exigent circumstances where the police create the exigency by violating the law, in this case, violating the principles of our Jardines by not going to the front door and knocking. Let me ask you one other thing, and I'll let you go over. Sure. And I'm just going to put the questions out there. We're all adults here. One of your arguments, the violation of one of your arguments of at least damages, and I think maybe a constitutional violation too, is that they frisk Harold Smith, right? Yes, sir. Okay. He was wearing boxer shorts. Yes, sir. How does one frisk somebody wearing boxer shorts? It's a tie-down of the outer clothing. All right. Was your client's deposition taken? Yes, sir. He didn't testify that he was frisked. You pleaded, but he didn't testify to it. The police admitted that. Well, what the police officer said was, let me read from the transcript. It's more accurate. And at the time that Mr. Smith is handcuffed, did you conduct any sort of pat-down? I'm going to proffer to you that my understanding is it was in boxer shorts, pat-down of Mr. Smith's boxer shorts to ascertain whether he was carrying a weapon. I don't recall that. Again, my proper procedure would be immediately to go to an outside frisk for weapons. I'm sure I did that, but I don't recall. I think Sergeant Confreda, whose deposition was taken first, agreed that there's always going to be a pat-down. That was just their standard procedure, sir. So it was a non-issue for the litigation because we all understood that they were not going to not pat down the person that's brought out there. Is that material to the violation? I don't think so. I think the issue with the violation is simply whether, under circumstances where they don't pat down two females, the argument is that we immediately recognized Harold Smith's not-normal-as-Piravellas, that they knew that the moment he comes out. We don't pat down the females. What is the basis for doing this? The records show whether there were any female officers present. They weren't handcuffed either, Your Honor. That's not my question, Counsel. There were no female officers on the game-over task force that day. But they were not handcuffed either. They said Harold Smith was the most cooperative guy they ever met, totally pleasant, and they decided to interrogate him and use those handcuffs to figure out what was going on. All right. Under the Fourth Amendment, that's not a proper reason to handcuff somebody. Thank you, Mr. Kearney. We'll let you go five minutes over. We'll give you two and reply and hear now from Mr. Grant. Thank you. Good morning. Jeff Grant on behalf of the defendant officers. First of all, this was not just simply a knock-and-talk investigation. This was a search for a wanted violent criminal. So let me ask you this, just picking up on that point. Can you then pick up the thread of the Chief's questions about exigent circumstances? I have the same questions, whether or not, notwithstanding Payton, notwithstanding Stigall, they could have gone into the house under an exigent circumstances theory to bring him out. Well, there was a recent case out of Orange County, an 11th Circuit case called Hill, which is cited, I believe, in our reply brief. And very similar circumstances. An arrest warrant was obtained for a suspect who had essentially robbed a shoe store, I believe, tied up the clerk, used a gun, and they tapped his phone, found him to go into an apartment building mistakenly, and they went in. And the court said, you can do that because there were exigent circumstances based on the fact that this guy was the subject of an arrest warrant and he could get out. Turned out he was never in there. But yes, based on that, you can go in. And so in part, your position is sort of the greater includes the lesser. If we could have gone in under exigent circumstances, then of course we can call him out from the sidewalk. And you might, frankly, citizenry, prefer us to call him out from the sidewalk than going in. Yes, correct. On the cross appeal, though, I want to talk about the handcuffing issue. Can I ask you a question about the cross appeal? Did you need the cross appeal? You won. Can't you argue just an alternative basis for affirmance? Correct, but it could have a precedential effect if it's held, handcuffing someone under these circumstances was unconstitutional, albeit not clearly established. But it has no precedential effect. A district court decision has no precedential effect, doesn't bind even that district court in future cases. Correct. You can always argue we should have won for other reasons. Unless it's a separate claim or a separate affirmative defense, you don't have to cross appeal. But you're here regardless, I guess. Listen, I've been a lawyer recently enough. I understand the hydraulic pressure to make sure you've preserved your arguments. I'm not faulting you for it. I'm just saying I don't think the cross appeal is necessary here. But you can argue the issue. Yeah, of course. And it's kind of relevant because there are still existing state law claims that are sitting over in Brevard County. Yeah, but we're not concerned about race judicating state court, and I'm not sure they would be race judicating anyway, but whatever. Go ahead. Now, so as far as handcuffing Mr. Smith, yes, they did not believe he was Pierre Willis, but they did it for security purposes to preserve the status quo in a situation where they didn't know who was in the house. And the Blackman case from 1995, 11th Circuit, FBI calls out suspects under similar circumstances, and they're handcuffed briefly. And Mr. Smith is handcuffed for, according to him, maybe 10, 15 minutes. Agent Guilford says it was about two to three minutes. So we believe that that was a legitimate law enforcement decision. Next. I don't have anything else. We'll rest on it. Did the officers have to handcuff Mr. Smith there, or could they just have let him walk around like the women? Well, the testimony was Mr. Smith came out first, didn't know who he was. They knew he wasn't the man they're looking for, didn't they? They knew he was not that man, but they didn't know if that man was still in the house. And by the time the wife and the daughter came out, they had already been talking to Mr. Smith and realized, okay, we don't need to cuff them for any reason. But he was still cuffed. Yes, he was. Mr. Smith was in cuffs when the women came out, and he stayed in cuffs for a while, right? Until the sweep was conducted inside the house. Yes, sir. How long was that? The sweep? Three minutes. According to Mrs. Smith, the whole incident lasted 20 to 25 minutes, start to finish. So he was handcuffed 20 minutes? No, I think Guilford's testimony is two to three minutes. So it took 20 minutes for him to come to the house and the officers to pat him down and handcuff him? Come out of the house? I don't understand if the whole incident took 20 to 25 minutes how he could. I thought he was handcuffed until the end of the incident. Okay. Mrs. Smith said the whole incident lasted 20 to 25 minutes. Got it. Agent Guilford said he cuffed Mr. Smith for about two to three minutes. After he was pulled out, cuffed, sat down by the car, and then the daughter and the mother came out. And then they did a protective sweep, which lasted at least three minutes, and then the incident was over after 20 to 25 minutes, or then they took the handcuffs off of Mr. Smith and the incident continued for another five to ten minutes. Now, it doesn't add up. What portion of the 20 to 25 minutes, which we have to take as true for present purposes, what portion of that time was he handcuffed for three minutes? Where was it on the gradient? Let's do a line. Let's say he was handcuffed for ten minutes. And that's what he says, right? Is that part of the difficulty here? Yes. He says 10 to 15. Your officer says 2 to 3. We'll assume 10 to 15. It makes the timeline sort of work. Right. 2 to 3 doesn't make the timeline work. But 10 to 15, we'll assume it's 10 to 15. Either way. Yeah. Anything else? No, sir. Thank you. Mr. Carter, two minutes. Can I ask you, I hate to do this on your way to the podium, but would you ñ no, no, no. I'm sorry. You can keep going. But would you just address briefly the Hill case that he described about exigent circumstances? Yeah. Judge, it's a prototypical exigent circumstance case. They had the ñ it's a little confusing. It sounded like the bad guy has binoculars and is counter-surveilling the police who know they've been spotted, which gives rise to the exigency. And in hot pursuit, they go after this guy. I have absolutely no problems with Judge Martin's and whoever was on that panel's decision. I have no problems with exigent circumstances. I'm a former prosecutor. What I have problems with is suggesting that there's exigent circumstances when they weren't pled and weren't deposed. I have problems with sitting on the house next door long enough for Agent Stull to apply for a warrant and then coming back and claiming that there was some exigency. If there were exigent circumstances, they could have gone in the house next door also. They understood, and objectively, viewing the evidence in the light most favorable to my clients, it was the truth that there was no exigency prior to the enforcement action. Normellis, Pieravellis, who it turns out wasn't there, or the Smith family, certainly had no idea the police were outside. I guess in fairness, though, right, I mean you say if they'd had exigent circumstances, they could have gone into the house next door. Exigent circumstances here is really just sort of a counterfactual because they didn't go into the house. They didn't go into, what is it, 976. They did a call out at 976, realized rats, wrong house. Go to 974, do the call out, and Normellis' cohort tells them to F off, right? Yeah. So the point is now they've eliminated 976 Palmer as the place where he's at. They've got the phone beacon from one of the two houses, so they've got more evidence now he's at 974 Palmer. They still applied for the warrant, and in the warrant application, agents still wrote that the information they had is that this guy was hanging out on Palmer Street, not that he lived there. And that was the truth. They didn't know where he lived because he was truly transient because he was constantly running from the police. I think that at the end of the day, if you stamp this with exigent circumstances, under circumstances where it's because he's a bad guy, we have exigencies, you're operating under circumstances where the police will have carte blanche authority even in the absence of what the law defines as a true exigency to go in. That's great for the police, and they're going to catch a lot more people. It's really bad for the Fourth Amendment. It's really bad for the Smiths who made that house their home for a long time. It's really bad for the innocent people, and that's the problem under the Fourth Amendment is that reasonableness balance that we have to strike sometimes harkens against the police being as effective as they might be otherwise. And it's the court's responsibility, obviously, as the protectors of the Fourth Amendment, to draw that line somewhere. All I'm suggesting in this case is that their standard practice was to do this call out, and if you look at it objectively, in the light most favorable to my clients, there was no true exigencies that's been defined under the case law in this jurisdiction. And then the exigency that they created was caused in part by them violating the Constitution under Jardines and going on to the cartilage and using the point of a bayonet to extract these law-abiding citizens from the home under circumstances where the description that they had would have fit any black male. Thank you, Mr. Carney. Thank you, and I wanted to add that I usually come up here and get beat up at the Eleventh Circuit. I'm a civil rights lawyer. The preparation that this court does is taken for granted by the public. No one has any idea how hard the court works. I wish that they did, but I think you guys and the federal judiciary do a remarkable job, and I thank you. Appreciate that. We really do. Court, take that case and the others under submission, and we'll recess until tomorrow morning. All rise.